[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11334
Non-Argument Calendar
_____

D.C. Docket No. 6:14-cv-02010-KOB

RHONDA LYNN NICHOLS,

Plaintiff-Appellant,

versus

COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 8, 2017)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Rhonda Lynn Nichols appeals the district court's order affirming the decision of an administrative law judge ("ALJ") to deny her applications for disability insurance benefits and social security income, filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The ALJ found that Nichols suffered from several severe impairments—degenerative disc disease, obesity, depressive disorder, and borderline intellectual functioning—that made her unable to perform her past relevant work, but that Nichols was not disabled because there was other light, unskilled work she could still perform despite her impairments. After review, we affirm.

## I.  THE FIVE-STEP EVALUATION

A claimant for SSI benefits must prove she is disabled. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005); 20 C.F.R. § 416.912. Under the five-step sequential evaluation used to determine whether a claimant is disabled, the ALJ considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work; and (5) if not, whether, in light of her age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy." See 20 C.F.R.

2

§§ 416.920(a)(4)(i)-(v), 416.960(c)(2); see also Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011).

The claimant bears the burden to prove the first four steps. If the claimant does so, the burden shifts temporarily to the Commissioner to prove the fifth step. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999); 20 C.F.R. § 416.920(a)(4)(v) & (g).

In considering at the fourth and fifth steps whether a claimant can perform her past relevant work or can perform other work in the economy, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. See Phillips v. Barnhart, 357 F.3d 1232, 1238-39 (11th Cir. 2004); see also 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is a medical assessment of what the claimant can do in a work setting despite any mental, physical, or environmental limitations caused by the claimant's impairments or related symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC includes mental abilities, such as the ability to understand, remember and carry out instructions or respond appropriately to supervision, coworkers, and work pressure. Id. §§ 404.1545(c), 416.945(c). In assessing the claimant's RFC, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefore. Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987).

## II. ALJ'S FINDINGS

Here, the ALJ found, at steps one and two, that Nichols had not engaged in substantial gainful activity since October 26, 2009, the date she fell off a stool at work,[1] and that she had the severe impairments of "degenerative disc disease, including spondylosis and stenosis, and scoliosis of the lumbar spine, aggravated by [her] fall from a seated position on a stool, with radiation; obesity; depressive disorder; and possible borderline intellectual functioning versus mild mental retardation."

At step three, the ALJ concluded that Nichols's impairment or combination of impairments, both physical and mental, did not meet or equal a listed impairment. Specifically, relevant to this appeal, the ALJ determined that Nichols's intellectual impairments did not meet or equal the intellectual disability listing in Listing 12.05. See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05.[2]

---

[1]The ALJ mistakenly stated that the date of Nichols's fall was October 27, 2009, but medical records indicate that Nichols fell on October 26, 2009, her alleged onset date, and then went to the emergency room for treatment on October 27, 2009.

[2]On August 1, 2013, several months after the ALJ's decision, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." See Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499-01, 46,501 (Aug. 1, 2013) (codified at 20 C.F.R. pt. 404, 416). This change was made because "the term 'mental retardation' has negative connotations," and "has become offensive to many people." Id. at 46,499. The Social Security Administration stated that the change "does not affect the actual medical definition of the disorder or available programs or services." Id. at 46,500. Because the amendment does not effect a substantive change, we use the Social Security Administration's new wording.

At step four, the ALJ extensively reviewed Nichols medical records, the opinions of medical sources, and Nichols's subjective reports and hearing testimony, and concluded that Nichols had the RFC to perform light work with various exertional and non-exertional limitations.  The ALJ further concluded that, based on Nichols's RFC, she could not perform her past relevant work as a cook helper or hospital cleaner, as both of those jobs required medium-level work.[3]  The ALJ determined at step five that, considering Nichols's age, education, work experience, and RFC, there existed a significant number of jobs in the economy that Nichols could perform, including unskilled, light work as a cleaner, housekeeper, agricultural sorter, or laundry sorter.  Thus, the ALJ found that Nichols was not disabled.

## III.  NICHOLS'S APPEAL

On appeal, Nichols argues that: (1) substantial evidence did not support the ALJ's finding that her mental impairments did not meet or equal the criteria in Listing 12.05(B) or (C); (2) the ALJ failed to assess her mental and physical impairments in combination; (3) her back condition alone rendered her disabled; and (4) the ALJ failed to properly weigh the opinions of her treating physician, Dr.

---

[3]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting and carrying of objects weighing up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," or, when the work involves lifting only light weights, "requires a good deal of walking or standing," or "involves sitting most of the time with some pushing and pulling of arms or leg controls."  Id. §§ 404.1567(b),416.967(b).

Mark Prevost, about the severity of her back condition.  For the reasons that follow, we conclude that Nichols's arguments lack merit.[4]

## A.    Listing 12.05 for Intellectual Disability

To prevail at step three, the claimant must prove with specific evidence, such as medical signs, symptoms, or laboratory tests, that her impairment meets or medically equals a listed impairment.  Sullivan v. Zebley, 493 U.S. 521, 532, 110 S. Ct. 885, 892 (1990) ("The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'").  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Id. at 530, 110 S. Ct. at 891.

To "meet" Listing 12.05, the claimant must satisfy the diagnostic description in the introductory paragraph and one of four sets of diagnostic criteria found in paragraphs A, B, C, or D.  20 C.F.R. pt. 404, subpt. P, app.1, § 12.00(A).  Listing 12.05's introductory description requires the claimant to have: (1) significantly

---

[4]When the Appeals Council denies review of the ALJ's decision, we review the ALJ's decision as the Commissioner's final decision.  Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).  We review the ALJ's decision for substantial evidence, and the ALJ's application of legal principles de novo.  Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  Substantial evidence is less than a preponderance and is relevant evidence that a reasonable person would accept as adequate to support a conclusion.  Id.  We may not decide the facts anew, reweigh the evidence, or make credibility determinations.  Id.

6

subaverage general intellectual functioning; (2) deficits in adaptive behavior; and (3) an onset of impairment before age 22.  Id. at § 12.05.

Of the four paragraphs, only paragraphs B and C are at issue here.[5] Under Listing 12.05(B) the claimant must establish a "valid verbal, performance, of full scale IQ of 59 or less" and under Listing 12.05(C) the claimants must show both a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Id. at § 12.05(B)-(C) (emphasis added).  In other words, both paragraphs B and C require an IQ score within a certain range that is valid.

The Social Security Administration has noted that standardized intelligence tests can assist in verifying the presence of intellectual disability, but form only part of the overall assessment and should be considered in conjunction with developmental history and functional limitations.  Id. at § 12.05(D)(6)(a).  This Court has concluded that a valid IQ score of 60 to70 after age 22 "create[s] a rebuttable presumption of a fairly constant IQ throughout [a claimant's] life." Hodges v. Barnhart, 276 F.3d 1265, 1268 (11th Cir. 2001).  However, a valid IQ score does not have to be conclusive of intellectual disability "where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily living activities and behavior."  Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992).

---

[5]On appeal, Nichols does not argue that her mental impairments meet the criteria in paragraphs (A) or (D) of Listing 12.05.

Furthermore, an ALJ may find, for purposes of Listing 12.05, that the results of an IQ test are incredible where the test results are inconsistent with the medical record or the claimant's daily activities and behavior. Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986).

Here, the ALJ did not err in concluding that Nichols did not meet the criteria for Listings 12.05(B) or (C). First, Listings 12.05(B) and (C) require valid IQ scores. Dr. Alan Blotcky performed a Wechsler Adult Intelligence Scale test on Nichols in 2013. Dr. Blotcky's IQ testing revealed a verbal comprehension index of 61, a perceptual reasoning index of 65, a working memory index of 66, a processing speed index of 71, and a full scale IQ of 59. However, the ALJ found these scores to be invalid. See 20 C.F.R. Pt. 404, subpt. P, app. 1, § 12.05(B)-(C).

As the ALJ noted, the only evidence of Nichols's intellectual impairments was Dr. Blotcky's consultative psychological evaluation, which was obtained at the direction of Nichols's counsel only after she was denied benefits administratively and not part of any treatment. The fact that Dr. Blotcky was a consulting psychologist who evaluated the claimant at her attorney's request, standing alone, would not be enough to invalidate Dr. Blotcky's IQ test results.

The ALJ, however, further noted that Nichols originally filed for benefits based only on her physical impairments, that her medical records contained no evidence of mental health treatment or cognitive intellectual difficulties, and that

8

she never reported any cognitive or intellectual difficulties to the Social Security Administration before Dr. Blotcky's evaluation.  To the contrary, Nichols actually reported a range of activities and accomplishments that were inconsistent with Dr. Blotcky's IQ test results, including reading and understanding English; having a driver's license; completing high school with a certificate; a history of unskilled work, sometimes for periods of one year or more; successfully raising two children on her own; and handling money.  As the ALJ explained, "the totality of the objective and even subjective evidence prior to the evaluation shows that the claimant enjoyed adaptive functioning far greater than the scores generated during the evaluation."  We cannot say the ALJ's reasons as a whole for finding the IQ scores invalid are not sufficient.  See Popp, 779 F.2d at 1499-1500.

Second, even if the IQ scores obtained by Dr. Blotcky were valid, they were, as the ALJ explained, inconsistent with the record evidence regarding Nichols's daily living activities and behavior and indicated that Nichols enjoyed a greater degree of adaptive functioning than reflected in her scores.  See Lowery, 979 F.2d at 837.  The ALJ's findings as to Nichols's daily activities and behavior are supported by substantial evidence.  Nichols herself reported that she cooked meals, performed light housework, went shopping, paid bills, and counted change and that she did not need to be reminded to go places or to be accompanied when she went places.  She obtained her driver's license after taking an oral exam, she purchased

9

a car with money she borrowed from her sister, and she drove and maintained that car.  Nichols indicated that she did not have problems with memory, completing tasks, concentration, or following instructions.  She also raised her two, now-grown children, cooking and cleaning for them, helping them with their homework, and getting them ready for school.  Nichols's work history included housekeeping at a nursing home and working as a cook in several restaurants.  She left the nursing home job to find better paying work and the restaurant jobs because she did not get along with her boss.

In light of this record, the ALJ did not err in concluding that Nichols did not meet the criteria of Listing 12.05(B) or (C).  See Lowery, 979 F.2d at 835; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a).  As to Listing 12.05(C) specifically, although the ALJ found Nichols's physical impairments to be severe, Nichols could not meet that listing because she had to establish both the physical and the mental impairment prong.  See Sullivan, 493 U.S. at 530, 110 S. Ct. at 891; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).

**B.    Evaluation of Nichols's Impairments in Combination**

When a claimant has alleged several impairments, the ALJ has a duty to consider the impairments in combination and determine whether the combined impairments render her disabled.  Jones v. Dep't of Health and Human Servs., 941 F.2d 1529, 1533 (11th Cir. 1991).  This duty applies even when the impairments

10

considered separately are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 n.2 (11th Cir. 1985).  An ALJ's statement that the claimant did not have an impairment or combination of impairments that rendered her disabled constitutes evidence that he considered the combined effects of her impairments.  See Wilson, 284 F.3d at 1224.

Here, the ALJ explicitly stated several times that he was considering Nichols's mental and physical impairments, both severe and non-severe, in combination.  The ALJ also stated that he had considered the entire record, all symptoms, and the extent to which those symptoms could be accepted as consistent with all other evidence.  Furthermore, it is readily apparent from the ALJ's exhaustive discussion of Nichols's various impairments and their functional limitations that the ALJ considered the combined effect of her impairments.  Thus, there is no merit to Nichols's claim that the ALJ failed to evaluate her impairments in combination.

## C.    Nichols's Back Impairments

Nichols alternatively contends that her back impairments alone rendered her disabled at step five based on two interrelated arguments.  Specifically, Nichols maintains that the ALJ's finding that she could perform light work conflicts with the opinion of Dr. Mark Prevost, her treating physician, that Nichols's back pain

prevented her from working and that the ALJ was required to assign Dr. Prevost's opinion great weight.

In assessing a claimant's RFC at steps four and five, the ALJ must consider the different medical opinions found in the record.  In determining how much weight to give a medical opinion, the ALJ considers such factors as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization.  See 20 C.F.R. §§ 404.1527(c), 416.927(c).  A treating physician's medical opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004) (quotation marks omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (requiring the ALJ to give "good reasons" for not giving controlling weight to the treating physician's opinion).  This Court has found "good cause" to exist where: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records.  Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011).  The ALJ must "clearly articulate the reasons for giving less weight" to a treating physician's opinion.  See Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  However, an ALJ may reject any medical

opinion if the evidence supports a contrary finding.  Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985).

Here, Dr. Prevost is an orthopedic surgeon to whom Nichols was referred through her employer's worker's compensation insurance after she fell at work. Dr. Prevost took x-rays and an MRI of Nichols's spine and reported degenerative changes in her lumbar spine, including stenosis, scoliosis, and spondylosis.  Dr. Prevost believed that Nichols's degenerative changes developed over a long period of time and that her pain could have been triggered by her fall when a nerve was pinched.

Dr. Prevost initially released Nichols to light sedentary work.  Over the course of two months, Dr. Prevost prescribed two lumbar epidural injections, the first of which provided more relief than the second.  When Nichols continued to experience pain, and her employer did not have light duty work for her, Dr. Prevost ordered four weeks of physical therapy and kept Nichols off work during that time. Afterward, Dr. Prevost reported that the physical therapy "helped a little bit," but that Nichols still had "a lot of pain."  Dr. Prevost noted that he "would like to try getting [Nichols] back to work" and, if the employer did not have light work, to see how Nichols fared with some limitations, such as no prolonged standing.

At her next follow-up visit, Nichols reported that she was still unable to work and had been laid off from her job.  Dr. Prevost advised her that she would

13

either need to learn to live with the pain or to have back surgery, but that he wanted to avoid surgery if possible.  Dr. Prevost put Nichols at maximum medical improvement and released her to return to work at full duty with a disability rating of five percent partial permanent impairment to the whole person.

When Nichols returned two months later with "terrible" back and leg pain, Dr. Prevost took additional x-rays of her spine, which showed no changes.  In his treatment notes, Dr. Prevost wrote:

> I believe that this is probably a pain that is going to prevent her from working.  It is probably not related really to the workman's comp and is more related to the degenerative scoliosis and arthritis, at those levels, which has taken years to develop.  I recommend that she apply for disability, at least for a period of time, to get her back fixed, because I do not think that we can get her working without getting her back fixed.  We will give her a prescription today for Soma 350mg and see her back on a prn basis.

The same day, Dr. Prevost advised the worker's compensation contact that Nichols had no work restrictions.  In a subsequent deposition, Dr. Prevost opined that the majority of people with Nichols's back condition would have experienced relief from symptoms with the conservative treatment he had provided, but that Nichols's case appeared to be "turning into a chronic situation."

The ALJ stated that he "found it difficult to weigh" Dr. Prevost's opinion because of "the obvious conflict in his actions," first releasing Nichols to light and then full duty work without restrictions, but then two months later recommending that she seek disability benefits.  Ultimately the ALJ gave Dr. Prevost's opinions

14

"some but not great weight," because: (1) an objective assessment of Dr. Prevost's opinions, recommendations, and actions indicated he believed Nichols could return to some kind of work, perhaps with limitations on standing and lifting; (2) Dr. Prevost was concerned with whether, from a worker's compensation perspective, Nichols could return to her previous work, not with whether she could do any work; and (3) the totality of the evidence indicated that her RFC, which included exertional limitations, more accurately reflected Nichols's level of impairment.

The ALJ adequately explained his reasons for giving Dr. Prevost's opinion less than great weight, and those reasons constitute "good cause" and are supported by substantial evidence. Although Dr. Prevost's medical examinations revealed pain, decreased range of motion, and degenerative conditions in her lumbar spine, other tests (motor strength, reflexes, sensation, straight leg raise, etc.) were normal. Despite Nichols's continued reports of pain, Dr. Prevost eventually recommended returning her to work at full duty. And, after Dr. Prevost reported in May 2010 that Nichols could not work due to pain and suggested she apply for disability benefits, Nichols sought no treatment for her condition between July 2010 and November 2011.

In addition to Dr. Prevost's own treatment notes, other medical evidence in the record suggests Nichols's back pain did not prevent her from performing some light work. For example, Nichols's next doctor, Dr. Scott Boswell, continued to

15

administer conservative treatments such as cold pack therapy and some prescription medications. After receiving a prescription from Dr. Boswell in July 2011, there was no evidence of additional treatment for her back condition until January 2012. The ALJ noted that Dr. Boswell reported no objective signs of impairment.

Nichols's disability report in December 2011 showed that she was taking only over-the-counter medications, Aleve and Tylenol. In January 2012, Dr. Hasmukh Jariwala, a consulting doctor who examined Nichols, noted some lumbar spine impairments, but stated that the impairment was mild to moderate, her gait was normal, she showed no signs of muscle spasms, she could walk on her heels and toes, she could squat and arise with assistance, and she had walked into Dr. Jariwala's office without difficulty. Accordingly, we find no reversible error in the ALJ's evaluation of Dr. Prevost's opinion or in the ALJ's conclusion that Nichols could perform light work with the exertional and nonexertional limitations included in his RFC assessment.

### III.  CONCLUSION

For all these reasons, we conclude that substantial evidence supports the ALJ's determination that Nichols was not disabled.

**AFFIRMED.**

16